**WILLIAMSON SHAFT CONTRACTING COMPANY, Appellant,**

v.

**Charles K. PHILLIPS and Benefits Review Board, United States Department of Labor, Appellees.**

No. 85–3457.

United States Court of Appeals, Third Circuit.

Argued April 14, 1986.

Decided June 30, 1986.

William Howe (argued), Richard B. Fellows (argued), Richard A. Steyer, Loomis, Owen, Fellman & Howe, Washington, D.C., for appellant.

R. Wallace Maxwell (argued), Maxwell & Davis, Waynesburg, Pa., for appellee Charles K. Phillips.

George R. Salem, Deputy Sol. of Labor, Donald S. Shire, Associate Sol., J. Michael O'Neill, Counsel for Appellate Litigation, Bruce A. McDonald (argued), Mark Robson, Office of Sol., Washington, D.C. for appellee—U.S. Dept. of Labor.

Before SEITZ, HIGGINBOTHAM and BECKER, Circuit Judges.

### OPINION OF THE COURT

BECKER, Circuit Judge.

When, in 1977, Congress expanded the coverage of the Federal Coal Mine Health

and Safety Act of 1969, 30 U.S.C. § 801 *et seq.*, to provide for Black Lung benefits to employees of coal mine construction companies, it did so by expanding the definition of "miner" to include coal mine construction workers exposed to "coal dust." A subsequent regulation promulgated by the Secretary of the Department of Labor clarified the definition of miner to include coal mine construction workers exposed to "coal mine dust." 20 C.F.R. § 725.202(a) (1978). Appellant, Williamson Shaft Construction Company ("Williamson"), a coal mine construction company required by the Benefits Review Board to pay Black Lung benefits to a former employee, alleges that the regulation constitutes an unwarranted and invalid rewriting of the statute. However, the legislative history reveals that in 1969 Congress understood the terms "coal dust" and "coal mine dust" to be interchangeable, and there is scant evidence that Congress understood the terms differently in 1977. We therefore conclude that the regulation was a legitimate clarification of the statute. Hence, we deny the petition for review and affirm the award of benefits.[1]

## I. FACTS AND PROCEDURAL HISTORY

Appellee-claimant, Charles Phillips, worked as an underground coal miner and coal mine construction worker from 1946 through 1972. His co-appellee is the United States Department of Labor's Office of Workers' Compensation Programs, which also urges that we uphold the award of benefits.

Between 1946 and 1953, Phillips was an underground miner for three different coal mine companies. From 1955 until 1966, he worked in coal mine construction for a fourth company. From 1966 to 1972, he worked intermittently for Williamson on several coal mine construction projects.

Coal mine operators often hire independent construction companies such as Williamson to construct the facilities and structures necessary for mining. Coal mine construction consists of preparing vertical openings (shafts) and inclined tunnels (slopes) between the surface of a coal mine and a coal seam. The purpose of the shafts and seams is to move men and material in and out of a mine. Williamson's brief describes the actual processes of coal mine construction as follows:

> The construction of shafts [and slopes] can be divided into three different phases. The first phase involves preparing the surface area. During this phase construction equipment is moved into the area and put in place.... The second phase consists of excavating the shaft down to the desired coal seam. Once an initial excavation is made and collared to a depth of about twenty-five feet, further excavation is performed by drilling, blasting, and mucking.... The material removed during excavation consists mainly of sandstone, limestone, shale and clay. A small amount of coal is also removed from incidental coal seams which may be encountered before reaching the coal seam which is the goal of excavation.... Once the shaft reaches the main coal seam, the third, or final stage of construction begins. This stage is known as "bottom work." During this phase, enough coal is excavated from the seam so that the mining company will have sufficient space to begin mining operations.

Appellant's brief at 4–5. Thus, Williamson's construction workers spend a portion of their time (the third phase) in an underground mine. It was calculated that during his employment with Williamson, Phillips worked in an underground coal mine for anywhere from three to six months (the exact amount of time was disputed on the record). The rest of the time he worked around a coal mine.

In 1983 Phillips applied for Black Lung benefits. The Secretary of Labor recommended that he be awarded benefits against Williamson, the "responsible opera-

---

1. We have jurisdiction pursuant to 33 U.S.C. § 921(c) (1982).

tor." [2] Before the Administrative Law Judge ("ALJ"), Williamson argued that it was not the "responsible" operator under the statute because it had not employed Phillips as a "miner" for one year as required by the regulation defining "responsible operator." 20 C.F.R. § 725.493(a)(1). Rather, Williamson contended, it employed Phillips as a miner for a maximum of six months, *i.e.*, that period during which he excavated coal or was otherwise working at the bottom of the shafts in underground mines.

Williamson's position was based on the language of the Black Lung Benefits Reform Act of 1977, 30 U.S.C. § 801 *et seq.* (1982), which makes coal mine construction workers "miners" to the extent that they are exposed to "coal dust." 30 U.S.C. § 902(d). According to Williamson, "coal dust" is dust that comes directly from coal, and therefore Phillips could have been exposed to coal dust only during the three to six months he worked in the underground coal mines; hence, he was a "miner" for less than a year. The ALJ rejected this position, citing regulation 20 C.F.R. § 725.202(a), promulgated subsequent to the 1977 Act, which states that a construction worker is a "miner" to the extent that he is exposed to '*coal mine dust.*' Because 20 C.F.R. § 725.202(a) establishes a rebuttable presumption that a coal mine construction worker is exposed to coal mine dust, and Williamson made no attempt to rebut that presumption, the ALJ found that Phillips was a "miner" for the entire duration of his employment with Williamson.

Before the Benefits Review Board, Williamson challenged the validity of the regulation, alleging that it contravenes the charter of the underlying statute by defining as miners construction and transportation workers exposed for a year to "coal mine dust," whereas the statute provided coverage only to those exposed to "coal dust." [3] The Board summarily rejected this argument, citing its previous decision in *George v. Williamson Shaft Contracting Co.*, 8 Black Lung Rep. 1–91 (1985), upholding the regulation. This appeal followed.

## II. *STATUTORY HISTORY*

In 1969, Congress addressed the growing problem of the health hazards of coal mining. In discussing the dusts to which miners were exposed, Congress used the terms "coal dust," "coal mine dust" and "respiratory dust" interchangeably to refer to all dusts around a coal mine. This point is well illustrated by comments made by Representative Hechler of West Virginia:

> [I]t is now possible, feasible, technologically, and economically within reason to make a drastic reduction in the amount of *coal dust* at the working face of a coal mine. This fact is very dramatically illustrated in the Bureau of Mines Technical Progress Report entitled "Studies on the Control of Respirable *Coal Mine*

**2.** By regulation, only one employer can be responsible for a miner's claim. 20 C.F.R. § 725.493(a)(1). The regulation defines the responsible operator as the "operator or other employer with which the miner had the most recent periods of cumulative employment of not less than 1 year ..." *Id.* An employer can be held responsible only if the claimant worked for him for at least one day after 1969. 30 U.S.C. § 932(c) (1982). Since 1969, Phillips has worked for only one company other than Williamson and did so for less than one year (his total time working for Williamson was well over a year). Therefore, Williamson is the only operator potentially "responsible" for Phillips' benefits. Williamson points out that Phillips is eligible for compensation from the Black Lung Disability Trust Fund. From Phillips' standpoint, therefore, the outcome of this case may

be academic, simply a matter of "who pays." However, there is a definite case and controversy because not only is Williamson's liability at stake, but this case has serious ramifications for co-appellee, the Department of Labor. Should we strike down 20 C.F.R. § 725.202(a) and define "coal dust" as appellant urges, we would significantly reduce the universe of claimants eligible for black lung benefits. For while Phillips happens to be eligible for payments from the Black Lung Disability Trust Fund by virtue of having worked as an underground miner for many years, many coal mine construction and transportation workers are not.

**3.** Williamson does not take issue with the regulation's creating a rebuttable presumption of exposure for coal mine construction workers.

*Dust* by ventilation." .... In a release dated October 28, the Bureau of Mines states that "improved ventillating methods were used to reduce the concentration of *respirable dust*, the cause of 'black lung' Disease."

115 *Cong.Rec.* 31,936 (1969) (emphasis added).

The Spindletop Research Group's report, which was relied on by Congress, also used "coal dust" and "coal mine dust" interchangably. *See* 115 *Cong.Rec.* 32,015 (1969) (in which Congressman Dent of West Virginia introduced the conclusions and a synopsis of the report). The Spindletop report explained that the hazards of the coal mine environment went well beyond direct exposure to coal:

> There is evidence that in addition to coal mine dust, other factors such as infection, for example by mycobacteria, and immunological phenomena or both may be involved in the pathogenesis of PMF [progressive massive fibrosis].... Not only the mixed dust in coal mines but other potentially injurious factors in the mining environment require further investigation. Among these are gaseous atmospheric contaminants.

*Id.* at 32,017. To meet this growing hazard, Congress enacted the Federal Coal Mine Health and Safety Act, which provided benefits for coal miners who were afflicted with pneumoconiosis ("Black Lung" disease). Taking heed of the warning that miners were endangered by dusts other than those coming directly from coal, Congress defined pneumoconiosis broadly as "chronic dust disease of the lung arising out of employment in an underground coal mine." 30 U.S.C. § 902(b). It defined "miner" as "any individual who is or was employed in an underground coal mine." 30 U.S.C. § 902(d).

In 1977, Congress passed the Black Lung Benefits Reform Act, an amendment to the 1969 Act. The 1977 Act, *inter alia*, made certain coal mine construction and transportation workers eligible for Black Lung benefits. It did so by broadening the definition of "miner."

> The term "miner" means any individual who works or has worked in or around a coal mine or coal preparation facility in the extraction or preparation of coal. Such term also includes an individual who works or who has worked in coal mine *construction or transportation in or around a coal mine, to the extent such individual was exposed to coal dust as a result of such employment.*

30 U.S.C. § 902(d) (emphasis added). The very limited legislative history concerning this provision suggests that Congress wished to provide coverage for coal mine construction workers to the extent that they worked in conditions substantially similar to the conditions in which miners work.

## III. *REGULATORY AND ADMINISTRATIVE HISTORY*

Shortly after the 1977 Act, the Secretary of the Department of Labor promulgated a regulation which, *inter alia*, clarified the definition of "miner" for the purposes of the Act:

> *Miner defined....* A coal mine construction or transportation worker shall be considered a miner to the extent such individual is or was exposed to *coal mine dust* as a result of employment in or around a coal mine or a coal preparation facility. In the case of an individual employed in coal transportation or coal mine construction, there shall be a rebuttable presumption that such individual was exposed to *coal mine dust* during all periods of such employment occurring in or around a coal mine or coal preparation facility for purposes of (1) Determining whether such individual is or was a miner....

20 C.F.R. § 725.202(a) (emphasis added).[4] Significantly, this regulation defined a coal

---

**4.** Congress has authorized the Secretary of Labor to "issue such regulations" as it "deems appropriate to carry out the provisions of this subchapter." 30 U.S.C. § 936 (1982).

mine construction worker as a "miner" if he was exposed to "coal mine dust," whereas the 1977 Act had spoken of "coal dust."

The regulation has since been challenged, but the Board has upheld it, albeit without much analysis. *George v. Williamson Shaft Contracting Co.*, 8 Black Lung.Rep. 1–91 (1985); *Conley v. Roberts and Schaefer Co.*, 7 Black Lung Rep 1–309 (1984).[5]

## IV. DISCUSSION: THE LEGITIMACY OF THE REGULATION

The Secretary's regulation "will be sustained so long as it is 'reasonably related to the purposes of the enabling legislation.'" *Mourning v. Family Publications Service, Inc.*, 411 U.S. 356, 369, 93 S.Ct. 1652, 1661, 36 L.Ed.2d 318 (1973), *quoting Thorpe v. Housing Authority of the City of Durham*, 393 U.S. 268, 280–281, 89 S.Ct. 518, 525, 21 L.Ed.2d 474 (1969); *see also Wheeler v. Heckler*, 787 F.2d 101 (1986, 3d Cir.). However, "the role of agencies remains basically to execute legislative policy; they are no more authorized than are the courts to rewrite acts of Congress." *Talley v. Mathews*, 550 F.2d 911, 919 (4th Cir.1977). Williamson argues that the Secretary did, in effect, rewrite the statute. It contends that the plain meaning of "coal dust" is "dust emanating directly from coal," and that regulation § 725.202(a) simply runs roughshod over the 1977 Act by expanding this term to include other dusts.

The flaw in Williamson's argument is that Congress has never understood "coal dust" to have the "plain meaning" that Williamson attributes to it. Although the text of the 1969 Act does not include the words "coal dust" or "coal mine dust," as we have noted, *see supra* pp. 867–868, Congress understood the terms as interchangeable and as referring to the various dusts around a coal mine. When in 1977 Congress extended coverage to coal mine construction workers who were exposed for one year to "coal dust," it gave no indication that it understood the term differently from the way it did in 1969. Thus, the Secretary's interpretation of the 1977 Act is supported by canons of statutory construction under which "the legislature is presumed to know the prior construction of the original act, and if words or provisions in the act or section amended that had been previously construed are repeated in the amendment, it is held that the legislature adopted the prior construction of the word or provision." Sands, *Sutherland Statutory Construction*, Volume 1A, § 22.33 p. 288 (4th ed. 1985). Although "coal dust" was not in the text of the 1969 Act, the legislative history reveals what Congress understood it to mean. Therefore, this rule of statutory interpretation is applicable. Thus, absent evidence to the contrary, we must assume that 20 C.F.R. § 725.202(a) correctly clarifies what Congress meant in enacting the 1977 Act.

The burden, then, is on Williamson to demonstrate that the Secretary's regulation, providing that coal mine construction and transportation workers are eligible for benefits if exposed for a year to "coal mine dust," contravenes Congress' intent. Williamson attempts to meet this burden by focusing on Congress' substantive aims in passing the 1969 and 1977 Acts. William-

---

An earlier proposed regulation had said "coal dust" rather than "coal mine dust," and a change was suggested. A comment accompanying publication of the final regulation stated that

> The Department accepts the comment that the term "coal dust" should be changed to "coal mine dust." The Act [of 1969] defines pneumoconiosis as a "dust disease of the lung ... arising out of coal mine employment." Accordingly, exposure to any coal-mine-generated dust and ensuing disease or disability form a proper basis for entitlement.

43 Fed.Reg. 36778 (1978).

**5.** In an unpublished opinion involving a coal mine transportation worker, the Tenth Circuit implicitly upheld the regulation. *Morrison-Knudsen Co., Inc. v. Schaecterle*, no. 83–1777 (10th Cir.1984) ("The claimant need not present additional proof that he was exposed to coal dust and not just coal mine dust over ten years. It would be difficult to make such a distinction. This would defeat the goal of 30 U.S.C. § 902(d) in giving the miner the advantage in presenting his claim.") Rule 17(c) of the Tenth Circuit's Rules of Court permits citation of unpublished opinions.

son agrees that in 1969 Congress sought to provide coverage for miners who contracted pneumoconiosis from exposure to all dusts in the coal mine environment. It contends, however, that in passing the 1977 Act Congress did not intend to provide equally broad protection to coal mine construction workers and transportation workers. Rather, Williamson contends, Congress intended coal mine construction and transportation workers to be eligible for benefits only if they contracted pneumoconiosis from direct exposure to coal.

Williamson supports this contention by reference to the legislative history of the 1977 Act. However, the legislative history is too scant on this point to enable Williamson to establish that Congress understood the term "coal dust" differently in 1977 from the way it understood the term in 1969. The support for Williamson's position is a statement in the Senate Report of the 1977 Act that coal mine construction workers are miners "when they work in conditions substantially similar to conditions in underground coal mines," S.Rep. No. 95–209, 95th Cong., 1st Sess. (1977), *reprinted in* Committee on Education and Labor, House of Representatives, 96th Cong., *Black Lung Benefits Reform Act and Black Lung Benefits Revenue Act of 1977* at 624 (1979). Williamson interprets this statement to mean that construction workers are considered miners only to the extent that they work in underground mines. However, it is equally plausible that the term "substantially similar" conditions refers to conditions in which a worker inhales a similar quantity of dust from the coal mine environment as do miners. Under the latter reading, coal mine construction workers labor in conditions substantially similar to those of miners when they spend extended periods of time exposed to dusts in the coal mine environment.

The ambiguous statement in the Senate Report does not establish that in 1977 Congress understood the term "coal dust" differently from the way it understood the term in 1969. We conclude that Williamson has not carried the burden of demonstrating that the Secretary's regulation contravenes Congress' intent. At most, it has established some doubt as to Congress' usage of "coal dust." Even if the congressional intent is unclear, the deference we owe the Secretary's interpretation requires us to uphold the regulation 20 C.F.R. § 725.202(a). *See Chevron U.S.A., Inc. v. Natural Resources Defense Counsel, Inc.*, 467 U.S. 837, 843 & n. 11, 104 S.Ct. 2778, 2782 & n. 11, 81 L.Ed.2d 694 (1984) ("[I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.... The court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction.")

Our conclusion is supported further by congressional acquiescence in the regulation (which was promulgated 8 years ago and has been upheld by the Board, *see supra* p. 868). Congress, which has amended other sections of the Black Lung legislation and is presumably aware of the regulation, has not declared that the disputed regulation expands the intended meaning of "coal dust." *See Saxbe v. Bustos*, 419 U.S. 65, 74, 95 S.Ct. 272, 279, 42 L.Ed.2d 231 (1974) ("This longstanding administrative construction is entitled to great weight, particularly when, as here, Congress has revisited the Act and left the practice untouched."); *Beshaw v. Fenton*, 635 F.2d 239, 245 n. 6 (3d Cir.1980).

## V.  CONCLUSION

For the reasons set forth above, Williamson's Petition for Review will be denied and the decision of the Benefits Review Board will be affirmed.